# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **RUSS McKAMEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24-cv-000037** |
| | ) | **Judge Aleta A. Trauger** |
| **JUSTIN YERACE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is plaintiff Russ McKamey's Motion for Partial Summary Judgment (Doc. No. 112), which seeks judgment as to liability, though not as to the amount of damages, on Counts One, Two, Five, Eight, and Nine of the Complaint, against Justin Yerace as the sole remaining defendant in this case. Counts One and Two assert violations of two federal statutes, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and Stored Communications Act ("SCA"), 18 U.S.C. § 2707. Count Eight asserts a violation of the Tennessee Personal and Commercial Computer Act ("TPCCA"), Tenn. Code Ann. § 39-14-602 (Count Eight). Counts Five and Nine state claims under Tennessee common law for invasion of privacy through unreasonable publicity to private life and the intentional infliction of emotional distress. The defendant opposes the motion. For the reasons set forth herein, the motion will be granted in part and denied in part. Specifically, the motion will be granted as to the defendant's liability for violation of the SCA and invasion of privacy (Counts Two and Five) and denied as to Counts One, Eight, and Nine.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary

judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

A defendant seeking summary judgment only needs to show that the plaintiff lacks sufficient evidence to prove a single element of a particular claim in order for the defendant to be entitled to summary judgment on that claim. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) ("As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim."). Conversely, when a plaintiff moves for summary judgment on his own claims, for which he carries the burden of proof and persuasion at trial, he faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*,

270 F.3d 1036, 1056 (6th Cir. 2001). He must show the absence of a material factual dispute on all of the essential elements of his claim. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting *Cockrel*, 270 F.3d at 105)). The moving party "must always bear this initial burden, whether or not the adverse party responds according to the rules of civil procedure." *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992) (citations omitted). Summary judgment in favor of the party with the burden of proof "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## II.     FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Russ McKamey resides in Summertown, Tennessee, where he operates what he describes as a "popular, immersive theater experience in the genre of horror"–that is, a haunted house—"on his private property, the McKamey Manor." (Doc. No. 1, Compl. ¶ 18.) In October 2023, Hulu released a documentary entitled, "Monster Inside: America's Most Extreme Haunted House" (the "Documentary"), about McKamey Manor. Defendant Justin Yerace participated in the Documentary as an interviewee. Yerace later helped promote the Documentary; for a time, it went to the number one spot on Hulu.

Yerace stated in the Documentary:

So, I started a Facebook page called McKamey Manor Exposed. I wanted it to be a place where people could actually come, say what they needed to say without

---

[1] The facts for which no citation is provided are undisputed for purposes of summary judgment and taken directly from the defendant's Response to the Plaintiff's Statement of Undisputed Material Facts ("RSUMF") (Doc. No. 129).

having to worry about threats. The biggest thing we found though, was we actually got into Russ's emails. Russ has a very old email service and that's where he messed up. The company that Russ has for the email has a phone number. So, I called them, and I was like, 'Hey, yeah, I forgot my password.' So, they says, 'Okay, what's your name?' 'Russ McKamey.' He's like, 'Okay, when's the last time you were on your email?' And I was like, you know, I'm gonna make a good guess. I'll say, 'Oh, it was yesterday.' She's like, 'Yep, alright, that's correct.' I changed the password for my [sic] email address, and then I locked him out. We hit the jackpot.

. . . .

So I took those emails, I took screenshots, and I showed those. Here's the proof right here. This is, like, something you're never gonna see anywhere else. I put everything on my Facebook page[.]

(Compl. ¶ 65; Doc. No. 32, Answer ¶ 65.) Yerace also stated in the Documentary, "I wanted to do something. But I didn't know what kind of trouble I was gonna get into for getting into somebody's emails." (Compl. ¶ 63; Answer ¶ 65.)

"McKamey Manor Exposed" is a private Facebook group that Yerace started. He identified the group as "The Official Group from the Hulu Documentary 'Monster Inside: America's Most Extreme Haunted House.'" Yerace posted to this private Facebook group a collection of 60 screenshots of e-mails obtained from McKamey's email account. In connection with this post, he stated, "Since I get a TON of requests, here are (most) of the e-mails with a lot of personal info censored." (Doc. No. 115-16.) Yerace later reposted the 60 screenshots of Mr. McKamey's e-mails, stating, "For all the new members who didn't get to see Russ's e-mails when I hacked into his E-mail account here they are!!" (Doc. No. 115-17.) Yerace indicated that he was aware that McKamey was "very sensitive about the fact that his e-mails are public" but reposted a link to the emails anyway. (Doc. No. 115-23 at 2.) He was further aware that McKamey was "having a melt down over his e-mails," yet Yerace still invited people to message him if they wanted to see McKamey's emails by being "tagged to them." (Doc. No. 115-24.)

In another social media video post, Yerace stated:

But yes they are real. I'm not gonna fake 60, over 60 emails and just post them for you guys, I mean, that'd be crazy. We're all about telling the truth here. We don't do any lies, even if we're wrong, we'll tell ya. If there's something we're mistaken about, we'll let you know. But yea, the emails are real. I may or may not have gotten into his email, um, you know, that's what was there. The people that he emailed can tell you that they're real. If you guys ever talk to Holly again, um, Susan, whoever else he emailed there, they will simply tell you, "Yea, it's real. Everything's real."

(Compl. ¶ 88; Answer ¶ 88.) In a podcast interview several months after the Documentary was released, Yerace provided the same account as he had in the Documentary as to how he obtained access to McKamey's e-mail account.

The plaintiff deposed Yerace in connection with this lawsuit. When asked during his deposition whether his statements about accessing the plaintiff's email account were true, Yerace declined to answer, invoking the Fifth Amendment. When asked if he understood that, if he did not obtain McKamey's emails in the way described in the Documentary and podcast, it was "in [his] interest to explain . . . how [he] did actually obtain them," Yerace again "plead[ed] the Fifth." (Doc. No. 115-2 at 34, Yerace Dep. 216.) He invoked the Fifth Amendment when asked questions about contacting McKamey's email server and when the incident occurred, when asked to describe how he accessed McKamey's email account and obtained over 60 emails from that account, when asked to admit that he never received permission from McKamey to access his email account, and when asked to admit that, when he accessed McKamey's email account, he knew he did not have McKamey's permission to do so.

When asked, "Are you aware of any facts that could suggest that you did not access Mr. McKamey's Yahoo email account without authorization?" Yerace responded, "I don't recall." Asked to clarify what he did not recall, he answered, "If there was any facts or not." (Doc. No. 115-2 at 27, Yerace Dep. 167.) Likewise, when asked if he would "agree" that it was in his interest "to produce such facts," Yerace said, "I don't recall." (*Id.*) In his Response to the plaintiff's

Statement of Undisputed Material Facts, Yerace purports now to deny that he does not "recall whether any facts exist that could suggest he did not access Mr. McKamey's Yahoo email account without authorization," stating:

> Although at the time of deposition Defendant could not produce such facts, he also avers that many of the individuals involved in the community that has developed regarding Plaintiff's behaviors have expressed reasonable fear of participating in this action—therefore, he would clarify his testimony by stating that he could not—and still cannot—point to any facts that could make this suggestion and be presented in Court.

(RSUMF ¶ 25.) Yerace seems to be implying that he is covering for others. The court notes, however, that his denial is not supported by a reference to any evidence in the record, such as an affidavit or declaration by Yerace.

McKamey claims that, at some point in 2020, he tried to open his Yahoo email account but discovered that he had been logged out, which was unusual because he did not typically log out of his account. (Doc. No. 115-27, McKamey Aff. ¶¶ 5–6.) When he tried to enter his password, he received a notification that his password no longer worked. (*Id.* ¶ 7.) He claims that he retried the password "repeatedly" and "finally contacted a friend" to help him regain access to his email account. (*Id.* ¶ 8.) He claims that he was not able to regain access to his email account for "a few weeks," after "considerable effort." (*Id.* ¶ 9.) McKamey claims that he did not learn who had "blocked him from his email account" until shortly before the Documentary was released, when he began receiving screenshots of Yerace's Facebook posts showing McKamey's emails, which McKamey recognized as real emails from his private email account. (*Id.* ¶¶ 12–14.) After the Documentary was released in October 2023, a friend sent him a clip of the portion in which Yerace describes hacking McKamey's email account. (*Id.* ¶ 16.) McKamey relates in his Affidavit the emotional distress he experienced, allegedly as a result of Yerace's hacking his account and publicizing his private emails. (*Id.* ¶¶ 18–20.)

McKamey filed this lawsuit in April 2024 against numerous defendants including Yerace, but he later stipulated to the dismissal of all defendants except Yerace. (Doc. No. 65.) After Yerace answered the Complaint, the court granted in part McKamey's Motion for Judgment on the Pleadings, finding that Yerace's admissions established his liability on Count Four of the Complaint (*see* Doc. No. 66 at 11–13; Doc. No. 67), which sets forth a state law claim of invasion of privacy based on intrusion upon seclusion (Doc. No. 1 ¶¶ 129–31). The court otherwise denied the motion, specifically insofar as it sought to establish liability as a matter of law on the plaintiff's claims on Counts One, Two, and Eight of the Complaint. (Doc. No. 67.) Notably, the plaintiff's argument in support of judgment on the pleadings was based on Yerace's admissions that he had made statements in the Documentary and Facebook posts about hacking into McKamey's email account and taking screenshots of his private emails. The court found that Yerace's admissions that he had made these statements in the Documentary and Facebook posts were not tantamount to admitting that he actually did the things he claimed to have done.

Now, following discovery, the parties have stipulated to the dismissal of Counts Three and Ten of the Complaint (*see* Doc. No. 114), leaving Counts One, Two, Four, Five, Eight, and Nine pending against Yerace. Having already obtained judgment as to Yerace's liability on Count Four, the plaintiff seeks summary judgment as to liability on the other claims (again leaving for trial the quantification of his damages). The defendant opposes summary judgment, arguing that there remains a material factual dispute as to whether Yerace actually hacked the plaintiff's email account and that, regardless, the plaintiff has not established all of the necessary elements of each claim.

## III.     DISCUSSION

### A.     Count One: CFAA Claim

#### 1.     Statutory Framework

Based on the allegations in the Complaint (*see, e.g.*, Compl. ¶¶ 65–74, 79–80, 101–05), the court construes the plaintiff's CFAA claim to be premised upon 18 U.S.C. § 1030(a)(2)(C), which makes it a criminal offense to "(2) intentionally access[] a computer without authorization . . . and thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Another provision of the CFAA authorizes "[a]ny person who suffers damage or loss by reason of [its] violation" to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g). However, such a civil action "may be brought only if the conduct involves [one] of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.*

Only one of the factors set forth in subsection (c)(4)(A)(i) is relevant here: "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." *Id.* § 1030(c)(4)(A)(i)(I). Notably, "[d]amages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages." *Id.* § 1030(g).

The CFAA defines "loss" as both

> [1] any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, *and* [2] any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*Id.* § 1030(e)(11) (emphasis added); *see also Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073 (6th Cir. 2014) (observing that "'[l]oss is defined in the disjunctive" and distinguishing between the two clauses).

The term "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(1). A "protected computer," as relevant here, is one that "is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B).

      2.    *Discussion*

To be entitled to summary judgment on his § 1030(a)(2)(C) claim, McKamey must present evidence sufficient to establish that

> (1) [Yerace] intentionally accessed a computer; (2) the access was unauthorized or exceeded [his] authorized access; (3) through that access, [Yerace] thereby obtained information from a protected computer; and (4) the conduct caused loss to one or more persons during any one-year period aggregating at least $5,000 in value.

*Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 759 (6th Cir. 2020) (citing 18 U.S.C. § 1030(a)(2)(C)). McKamey, as the party bearing the burden of proof, must present evidence sufficient to satisfy each element, "whether or not the adverse party responds." *Wilson*, 954 F.2d at 351.

The plaintiff, without actually specifying the provision of the CFAA on which his claim is premised or setting forth the elements of the claim, asserts that he is entitled to summary judgment on his CFAA claim because (1) the undisputed facts now establish that Yerace hacked the plaintiff's email account; and (2) the plaintiff's requisite "damages" are established by his testimony that he was "locked out of his Yahoo e-mail account for weeks after Defendant change [his] password" and that he "underwent considerable effort during those weeks in his attempts to regain access to his email account." (Doc. No. 113 at 9.)

In his Response, Yerace purports to address the elements of a CFAA claim, but he does so incorrectly, at least for purposes of a § 1030(a)(2)(C) claim. Specifically, Yerace relies on a Sixth Circuit case addressing the elements of a so-called "transmission" claim under 18 U.S.C. § 1030(a)(5)(A), which is distinct from an "access" claim under § 1030(a)(2)(C) and makes it a crime to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer." (Doc. No. 128 at 8 (quoting *Pulte Homes, Inc. v. Laborers' Int'l Union*, 648 F.3d 295, 301 (6th Cir. 2011)).)[2] This provision is not at issue here because the plaintiff does not allege a "transmission."

In any event, Yerace concedes that McKamey's computer qualifies as a "protected computer" (*see* Doc. No. 128 at 4 n.1),[3] and there is no real dispute that any access by Yerace to the plaintiff's email account, if proven, was unauthorized or in excess of authorization. Yerace also concedes that he obtained possession of the plaintiff's emails—that is, he obtained

---

[2] *Pulte* also involved an "access" claim under 18 U.S.C. § 1030(a)(5)(B) or (C). Regarding that claim, the court held only that the plaintiff failed to allege access "without authorization" and therefore affirmed the dismissal of the access claim. *Pulte Homes*, 648 F.3d at 304.

[3] While the CFAA protects "computers," many of the courts that have considered the issue have for the most part concluded that "unauthorized access to web-based accounts can form the basis of a CFAA violation, even if the defendant had permission to use the physical computer in question." *Conlan Abu v. Mulholland*, No. 20-CV-12805, 2021 WL 12375343, at *3 (E.D. Mich. Sept. 27, 2021) (quoting *Hill v. Lynn*, No. 17 C 06318, 2018 WL 2933636, *3 (N.D. Ill. Jun. 12, 2018), and collecting cases holding that the statute's broad definition of "protected computer" encompasses unauthorized access to web-based email accounts); *see also Hill*, 2018 WL 2933636, at *3 n.4 (noting that to exclude web-based accounts from the statute's purview would fail to "consider the expansive definition of 'computer' in 18 U.S.C. § 1030(e)(1)")). Other courts have declined to construe the term that broadly. *See, e.g.*, *Owen v. Cigna*, 188 F. Supp. 3d 790, 793 (N.D. Ill. 2016) ("[T]he CFAA is aimed at unauthorized access to computers, not unauthorized access to web-based accounts."). Given both that the defendant apparently concedes this issue for purposes of summary judgment and that the court will deny summary judgment as to this claim, the court will not weigh in on this issue here, except to note that construing the CFAA so broadly as to cover web-based email accounts seems unnecessary given the scope of the SCA, discussed below, which expressly covers such accounts.

information from the plaintiff's computer. He argues, however, that the evidence in the record is not sufficient to establish that he "accessed" McKamey's email account. And, based on the elements of a transmission claim under § 1030(a)(5)(A), he focuses on the questions of whether the plaintiff can establish that the alleged unauthorized access caused "damage" to his computer as defined by the statute (Doc. No. 128 at 9–11) and whether the plaintiff has presented sufficient evidence of the defendant's intention to cause damage to his computer (*id.* at 11–12). The plaintiff filed a Reply in which he takes the bait, arguing that his allegations that he was blocked from his email account for a period of weeks is sufficient to establish "damages" for purposes of the CFAA and that Yerace's affirmative act of changing the plaintiff's email password establishes the requisite intent. (Doc. No. 138 at 7–8.)

In other words, the issues, as framed by the parties, are access and intentional damages.

a)      *Access*

Regarding the first element of his § 1030(a)(2)(C) claim, McKamey points out that Yerace, in the Documentary, his Facebook posts, and the podcast, "provided a consistent and detailed account of hacking into Mr. McKamey's Yahoo e-mail account." (Doc. No. 113 at 7.) Then, during his deposition, Yerace repeatedly invoked his privilege not to incriminate himself under the Fifth Amendment, rather than answering questions about the truth of the statements made elsewhere, giving rise to an inference that he actually did what he claimed to have done. In addition, the plaintiff makes much of a comment by Yerace in his deposition that the plaintiff construes as an admission by Yerace "that his statements in the Documentary were '[him] talking about what [he] *did*' not just what he *said* he did." (Doc. No. 113 at 7 (alterations in original) (quoting Doc. No. 115-2, Yerace Dep. 162).)

"In a civil case, a party's invocation of the privilege against compulsory self-incrimination gives rise to a legitimate inference that the witness was engaged in criminal activity." *Davis v.*

*Mut. Life Ins. Co.*, 6 F.3d 367, 384 (6th Cir. 1993) (citations omitted). The Supreme Court has confirmed that drawing a negative inference from a failure to testify in civil proceedings "violates neither the Fifth Amendment nor Due Process." *Hoxie v. Drug Enf't Admin.*, 419 F.3d 477, 483 (6th Cir. 2005) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976)). Moreover, such "[s]ilence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation." *Id.* (quoting *United States v. Hale*, 422 U.S. 171, 176 (1975)).

At the same time, there is no "blanket rule that allows adverse inferences to be drawn from invocations of the privilege against self-incrimination under all circumstances." *Lawrence v. Madison Cnty.*, 176 F. Supp. 3d 650, 663 (E.D. Ky. 2016) (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). Instead, "such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer." *Id.* (quoting *Doe*, 232 F.3d at 1264)); *see also Cholewa v. Robinson*, No. 19-CV-12190, 2025 WL 1156774, at *11 (E.D. Mich. Apr. 21, 2025); *In re Classicstar Mare Lease Litig.*, 823 F.Supp.2d 599 (E.D. Ky. 2011).

Yerace insists that his invoking the Fifth Amendment in this case does not constitute a "blanket assertion of guilt" and does not require an adverse inference. (Doc. No. 129 at 4–7.) The court finds, however, that Yerace's repeated and consistent statements in multiple contexts about how and why he hacked McKamey's email account constitute ample independent evidence that Yerace did what he claimed to have done. Only the defendant, in fact, would be able to explain how he came to be in possession of more than sixty of McKamey's private emails; more to the point, only Yerace would be capable of dispelling the clear implication that he accessed the plaintiff's email account precisely in the way he repeatedly claimed to have done. Confronted with

direct questions about whether his statements against his interest were true, McKamey chose not to clear up any ambiguity and instead invoked the Fifth Amendment. In these circumstances, Yerace's refusal to answer questions about whether those statements were true permits an adverse inference to be drawn against him. Further, for purposes of the plaintiff's Motion for Summary Judgment, the court finds that no reasonable jury presented with this evidence would fail to draw the adverse inference. In other words, any reasonable jury would find that the plaintiff has established by a preponderance of the evidence that Yerace, or Yerace in conjunction with others, knowingly accessed the plaintiff's email account without authorization.

The "admission" to which the plaintiff refers simply provides further corroboration of that conclusion. Specifically, the following exchange took place during Yerace's deposition:

Q. What would you say then was the purpose of you appearing in the documentary?

A. It was to let the public know about McKamey Manor and what truly goes on with their – with everything.

Can I elaborate?

Q. Yeah. Please give us your answer.

A. So when I did the documentary, when I was interviewed, the interview went on for about maybe four to five hours.

Q. Okay.

A. They just took a part of that longer interview and that's what they decided to use. *But besides me talking about what I did in the Hulu documentary*, there was also hours more of me discussing about McKamey Manor, my experience through it and everything else, which was the majority of it. And that's what I wanted to get out in the documentary was my story.

(Doc. No. 115-2, Yerace Dep. 162 (emphasis added).) Yerace argues that his comment does not amount to an admission. The court agrees that, by itself, the statement would not be sufficient to establish that he accessed the plaintiff's email account without authorization. Viewed in context, however, and given his later invocation of the Fifth Amendment, Yerace's reference to his "talking

about what [he] did" in the Documentary serves as further evidence that he accessed McKamey's email account in the way he explained in the Documentary.

In sum, the court finds that the plaintiff has established the "access" element of his CFAA claim for purposes of his Motion for Partial Summary Judgment.

### b) Damages

That finding, standing alone, does not entitle the plaintiff to summary judgment on his CFAA claim, because he must present evidence to establish each element of the claim. Irrespective of the parties' arguments about intentionally caused damages, however, the plaintiff does not bring a transmission claim at all, and his access claim under 18 U.S.C. § 1030(a)(2)(C) does not require a showing that Yerace's access to his computer "intentionally cause[d] damage," *id.* § 1030(a)(5)(A). What it requires instead is proof that Yerace's conduct "caused loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Royal Truck*, 974 F.3d at 759 (quoting 18 U.S.C. (c)(4)(A)(i)(I)). The loss must be in the form of *economic* damages, 18 U.S.C. § 1030(g), and it must consist of the reasonable costs of responding to the offense, lost revenue or costs incurred because of an interruption of service," *id.* § 1030(e)(11), "or a combination of both," *Yoder & Frey*, 774 F.3d at 1073.

Although neither party addresses this factor, the law nonetheless requires the plaintiff to present evidence that he suffered economic loss as required to recover on this claim. He has not done so. On this basis alone, the court finds that McKamey is not entitled to summary judgment on his CFAA claim.[4]

---

[4] The court further observes that McKamey does not appear to plead economic loss as defined by the CFAA in his Complaint.

**B.      Count Two: SCA Claim**

The SCA "imposes criminal and civil penalties on anyone who '(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.'" *Abu v. Dickson*, 107 F.4th 508, 520 (6th Cir. 2024) (quoting 18 U.S.C. § 2701(a)); *see also* 18 U.S.C. § 2707(a) (authorizing a civil cause of action to any person "aggrieved" by knowing or intentional conduct violating the SCA). As the Sixth Circuit has recognized, the CFAA and SCA have "several parallels," including that both "prohibit *intentional access without authorization* and *intentionally exceeding authorization*." *Abu*, 107 F.4th at 520 (emphasis in original) (citing 18 U.S.C. §§ 2701(a), 1030(a)(2)).

The term "electronic communication" is defined, for purposes of the SCA, *see* 18 U.S.C. § 2711(1), as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" (with exceptions not relevant here). 18 U.S.C. § 2510(12). "Numerous courts" have concluded that "this definition encompasses email." *Hately v. Watts*, 917 F.3d 770, 785 (4th Cir. 2019) (collecting cases).

"Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). By its plain language, "'any service which provides to users thereof the ability to send or receive' email messages constitutes an electronic communication service." *Hately*, 917 F.3d at 787. Accordingly, "companies such as [Yahoo] function as an electronic communication service[] when they provide email services through their proprietary web-based email applications." *Id.* at 790.

"Electronic storage" includes "any storage of [an electronic] communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Accordingly, emails, including opened and viewed emails, as well as sent emails of which the electronic communication service retains a backup copy, are in "electronic storage" for purposes of this definition. *Accord Hately*, 917 F.3d at 786.

Thus, to establish liability under the SCA, McKamey must simply prove that Yerace (1) accessed his personal Yahoo account (2) without authorization (or in a manner that exceeded his authorization) and (3) that such unauthorized access was intentional. *Accord Mitchell, Lewis & Staver, Co. v. Valley Farms Supply, LLC*, No. 1:21-CV-555, 2025 WL 703778, at *3 (W.D. Mich. Mar. 5, 2025). The statute authorizes the recovery of damages as well as attorney's fees and reasonable litigation costs. 18 U.S.C. § 2707(b)(2)–(3). Courts may assess as damages "the sum of the actual damages suffered by the plaintiff and any profits made by the violator as the result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000." 18 U.S.C. § 2702(c).

Yerace acknowledges that the SCA does not require proof of actual damages, but he argues that the plaintiff cannot prove that he accessed McKamey's email account, for the same reasons discussed above. And, for the same reasons discussed above, the court finds that the evidence in the record establishes that Yerace did access McKamey's email account without authorization, and that evidence stands unrebutted by any competent evidence to the contrary. There are no material factual disputes, and the plaintiff is entitled to summary judgment on his SCA claim, with the issue of actual or statutory damages to be resolved at trial.

### C.    Count Eight: TPCCA Claim

The TPCCA is primarily a criminal statute, Tenn. Code Ann. § 39-14-602, but violation of it may also give rise to a civil cause of action, *id.* § 39-14-604. The statute provides several avenues

of relief, including by authorizing a claim against anyone who "intentionally and without authorization, directly or indirectly[,] . . . access[e]s any computer, computer system, or computer network." Tenn. Code Ann. § 39-14-602(b)(1)(A). Subsection 602(a) provides that, whoever "k[n]owingly" accesses, directly or indirectly, or "cause[s] to be accessed, or attempt[s] to access any . . . computer software, computer program, data, computer, computer system, computer network, or any part thereof, for the purpose of obtaining . . . property. . . for oneself or another by means of false or fraudulent pretenses" is in violation of the TPCCA and subject to civil damages under section 604. *Id.* § 39-14-602(a)(1)(A)(i). In addition, anyone who "[m]ake[s] or cause[s] to be made" unauthorized copies "in any form" of computer data produced by a computer network is in violation of statute. *Id.* § 39-14-602(a)(1)(B)(ii). Likewise, anyone who "use[s]" or "aid[s] another in . . . using any proceeds resulting from a violation of this subsection (a), knowing the proceeds to be the result of such violation," violates the statute. *Id.* § 39-14-602(a)(1)(C).

Unlike the SCA, however, the TPCCA requires proof of actual damages: "Any person whose property or person is injured by reason of a violation of any provision of this part may file a civil action and recover for any damages sustained and the costs of the civil action." *Id.* § 39-14-604(a).

The plaintiff maintains that Yerace violated the TPCCA by (1) accessing his email account without authorization, (2) making unauthorized copies of Yerace's emails, and (3) using unauthorized copies of the emails. (Doc. No. 113 at 19–20 (citing Tenn. Code Ann. § 39-14-602(b)(1), (a)(1)(B)(ii), and 602(a)(1)(C).[5]) He asserts that he has presented sufficient evidence of damages based on accessing and copying, as he spent "weeks" without access to his email, until

---

[5] McKamey actually cites § 39-14-602(b)(5), which does not exist, and -602(c), which does not say what he says it does. The court presumes that he intended to refer to subsections 602(a)(1)(B)(ii) and (a)(1)(C).

he was able to find a friend to help him restore access to his email account. (*See* Doc. No. 115-27, McKamey Aff. ¶¶ 8–9.) He asserts that he has plausibly alleged damages arising from Yerace's posting of his private email messages, presumably meaning mental and emotional damages as well as potentially lost profits. (Doc. No. 113 at 21–22.)

The defendant asserts that the plaintiff is not entitled to summary judgment on this claim either, again because the plaintiff lacks evidence of the defendant's unauthorized access to his email account—an argument this court has already rejected. In addition, he contends that the plaintiff's conclusory statements about the purportedly monumental effort it took him to regain access to his email account and any other purported damages could be rejected by a jury.

The court agrees that there is a question of fact at this juncture regarding, not just the quantification of the plaintiff's damages, but whether he can establish actionable damages at all for purposes of the TPCCA. While the plaintiff contends that it took him weeks to regain access to his email account, a jury could very well choose to discount that testimony and to find that it could not have been that difficult—particularly given the ease with which Yerace apparently accessed the account. And the plaintiff alludes only tangentially to other damages he might have suffered that fall within the scope of the TPCCA. Summary judgment on this claim, therefore, is not warranted.

### D.      Count Five: Invasion of Privacy

The court already granted judgment on the pleadings as to liability on Count Four of the Complaint, for invasion of privacy in the form of intrusion upon seclusion. (*See* Doc. No. 67.) The plaintiff asserts a different invasion of privacy claim in Count Five—for "unreasonable publicity to private life." (Doc. No. 1, Compl. at 32.) The primary difference between these causes of action is the publicizing of the plaintiff's private information.

Although the Tennessee Supreme Court apparently has not recognized the tort of invasion of privacy based on the public disclosure of private facts, "Tennessee courts of appeal have recognized this tort." *Hoffman v. GC Servs. Ltd. P'ship*, No. 3:08-CV-255, 2010 WL 9113645, at *20 (E.D. Tenn. Mar. 3, 2010) (citing *Lineberry v. Locke*, No. M1999-02169-COA-R3-CV, 2000 WL 1050627, at *2 (Tenn. Ct. App. July 31, 2000); *Parr v. Middle Tenn. State Univ.*, No. M1999-01442-COA-R3-CV, 1999 WL 1086451, at *2–3 (Tenn. Ct. App. Dec. 3, 1999)); *see also Finley v. Kelly*, 384 F. Supp. 3d 898, 909 (M.D. Tenn. 2019) (Crenshaw, J.) (recognizing that Tennessee appellate courts have recognized the tort and finding that the plaintiffs stated a plausible claim).

Generally, "to prevail on a claim for public disclosure of private facts, plaintiff must show that another person gave publicity to a matter concerning plaintiff's private life" and that "the matter disclosed is both highly offensive to a reasonable person and not of legitimate concern to the public." *Parr*, 1999 WL 1086451, at *3; *see also Hoffman*, 2010 WL 9113645, at *20 (citing Restatement (Second) of Torts, § 652D). As Judge Crenshaw recognized, it seems that most of the opinions addressing this claim have focused on whether the private matter at issue was published to a sufficient number of people to satisfy the "publicizing" element of the claim.

Here, the defendant does not dispute that posting the plaintiff's emails on a Documentary, a podcast, and his Facebook page satisfied the "publicity" requirement. He argues instead only that there is a material factual dispute as to whether the posting of the private emails in question would be highly offensive, based on the "unique circumstances of this case." (Doc. No. 128 at 13.) He contends that the plaintiff is not a "private individual" but, instead, "a public figure whose entire persona is built upon horror." (*Id.*) He argues that other facts—including that the plaintiff and defendant have been involved in a public feud for a number of years and the plaintiff's public comments that he likes the publicity that the defendant's Facebook group provides McKamey

Manor—could lead a jury to "believe that, in the context of this case, Defendant's actions were not 'highly outrageous.'" (*Id.* at 14.)

The question, however, is whether the defendant's conduct would be "highly offensive to a *reasonable person*." Restatement (Second) of Torts § 652D (Sept. 2025 Update) (emphasis added). The court finds the reposting of private emails expressly for the purpose of causing the plaintiff distress is highly offensive, *per se*, and, moreover, that at least some of the emails in question are extremely intimate and embarrassing, such that publicizing them would be particularly offensive. This includes emails between the plaintiff and his former girlfriend and a particularly negative email to the plaintiff from his son. The court finds that the "highly offensive" standard has been met, though the question of the plaintiff's particular circumstances would likely affect the assessment of damages attributable to this publicity.[6]

The court finds, in short, that the plaintiff is entitled to summary judgment as to the defendant's liability on this claim, while the quantification of damages, if any, remains a jury question.

### E.    Count Nine: Intentional Infliction of Emotional Distress

The elements of an intentional infliction of emotional distress ("IIED") claim are that "the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Lemon v. Williamson Cnty. Schs.*, 618 S.W.3d 1, 21 (Tenn. 2021) (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012)). "The burden for a plaintiff to demonstrate outrageous conduct is a high

---

[6] The "highly offensive" criterion would also apply to Count Four, the plaintiff's invasion of privacy claim based on intrusion upon seclusion. The court did not address this factor in ruling on the plaintiff's Motion for Judgment on the Pleadings, because the defendant did challenge it.

burden indeed." *Id.* The Tennessee Supreme Court has "endorsed" the following standard for gauging whether a defendant's conduct satisfies that burden:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* (citations omitted). "[I]t is for the court to determine, in the first instance, whether the defendant's conduct *may* reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is *necessarily* so." *Id.* (emphasis added) (quoting Restatement (Second) of Torts § 46 cmt. h); *see also Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 704 (Tenn. Ct. App. 2012). Thus, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) of Torts § 46 cmt. h.

The plaintiff asserts that each element of this claim has been established: (1) the defendant's actions in posting and reposting his emails was clearly intentional; (2) the defendant's "enthusiastic" decision to post highly embarrassing emails, including intimate emails between McKamey and close family members and his former girlfriend, was "designed to cause maximum distress to Mr. McKamey" and "should be considered 'beyond all bounds of decency'" (Doc. No. 113 at 24); and (3) the plaintiff has presented evidence of his severe mental trauma, which he alleges manifested in extreme anxiety, insomnia, and months of depression, in addition to inducing him to quit his job, and that he received mental health treatment for his conditions for over a year (*id.* at 25–26; *see* Doc. No. 115-27, McKamey Aff. ¶¶ 18–20).

Upon reviewing Tennessee caselaw addressing the outrageousness factor, the court finds that the plaintiff's allegations are barely sufficient to permit—but not sufficient to require—a reasonable jury to find the defendant's conduct to be so outrageous as "to be regarded as atrocious and utterly intolerable in a civilized community" and to lead an average member of the community to exclaim, "Outrageous!" *Lemon*, 618 S.W.3d at 21. But a jury would not necessarily find the conduct to be outrageous. Summary judgment on the IIED claim is not warranted.

Further, while the plaintiff has provided evidence of his emotional distress in his Affidavit, whether a jury chooses to credit a plaintiff's testimony about emotional distress depends largely on the witness's credibility—as well as on the existence of underlying medical records to substantiate his testimony. It is possible that a jury could reject McKamey's testimony and conclude that his emotional distress was not sufficiently severe to satisfy the third factor of his IIED claim. For this reason, too, summary judgment on this claim is not warranted.

## IV. CONCLUSION

For the reasons set forth herein, the plaintiff's Motion for Partial Summary Judgment (Doc. No. 112) will be granted in part and denied in part. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge